## Case No. 1,792a.

### BRADSTREET v. HERAN.

[2 Blatchf. 116.] [1]

Circuit Court, S. D. New York. Oct., 1849. [2]

SHIPPING—CARRIAGE OF GOODS—BILL OF LADING —CONSTRUCTION—"IN GOOD ORDER AND WELL-CONDITIONED" — RIGHTS OF THE PARTIES — OF BONA FIDE PURCHASERS.

1. Where a bill of lading of bales of cotton describes them as "in good order and well-conditioned," those words have reference to the external condition of the cotton, and import that it was in good shipping condition at the time it was received on board of the vessel, but do not warrant the internal condition of the cotton in the bales.

2. Where cotton in bales was shipped at New Orleans for New York, and the master of the vessel gave a bill of lading for the cotton as "in good order and well-conditioned" when received on board the vessel, and it was in bad shipping condition when it arrived at New York, a large part of the bales being old and rotten, and badly torn and damaged, and the cotton being consequently soiled and damaged by exposure, and it appeared that the effects of this damage upon the external state of the cotton were developed at New Orleans before it was shipped: Held, on a libel in personam, in admiralty, by the master against the consignees of the cotton, to recover the freight, that, as the damage to the cotton exceeded the freight, the libel must be dismissed.

3. Held, also, that as the consignees had made large advances upon the cotton on the faith of the representation in the bill of lading, mat it was shipped "in good order," their security, as bona-fide purchasers, ought not to be lessened or impaired by permitting the master to contradict that representation.

4. Held, also, that as the cotton might have been sold for an excess beyond the advances, sufficient to cover the freight, the consignees were entitled to it in the condition described in the bill of lading, as security for their advances, without regard to the fluctuations of the market, or to sales to be made at any particular state of it.

In admiralty. John A. Bradstreet, master of the bark Lowell, filed a libel in personam in the district court, against Heran, Lees & Co., of New York, to recover a balance due him for freight on five hundred and seven bales of cotton shipped by that vessel from New Orleans to New York, and consigned to the respondents. The libellant had signed a bill of lading for the cotton on its shipment, which admitted that it was received on board the vessel at New Orleans "in good order and well-conditioned," and stipulated that it should be delivered "in the like good order and condition at the port of New York, the danger of the navigation only excepted."

The respondents, who had advanced a large amount upon the cotton on the faith of the bill of lading, set up, in answer to the libel, that the cotton was not delivered at New York in good order and well-conditioned, and that the damage to it exceeded the balance of the freight. The district court held that the libellant was responsible to the respondents for the damage to the cotton, and, that being proved to equal the balance of freight claimed, the libel was dismissed. [Case No. 1,792.] The libellant then appealed to this court. [Decree of the district court affirmed.]

Edwin Burr, for libellant.
Oscar W. Sturtevant, for respondents.

NELSON, Circuit Justice. It is admitted that the words, "in good order and well-conditioned," in the bill of lading, have reference to the external condition of the cotton, importing that it was in good shipping condition at the time it was received on board of the vessel, but not referring to or warranting the internal quality or condition of the cotton in the bales. The question, therefore, is, whether the damage sustained by the cotton arose from defects in the bagging of the bales or the manner of securing them from external injuries while being transported, or existed in the shape of external damage, at and previous to the loading of the cotton on ship-board, having been occasioned by its exposure to rain or wet, without proper protection, or by any other ill usage in its interior transportation before it reached the ship, and which was readily visible on inspection; or whether the damage was occasioned by the internal bad condition of the cotton, which was invisible to the eye at the time of shipment, and could only be detected by cutting and inspecting the bales.

The damage to the cotton was what is called "country damage," which results often from the bad condition of the cotton when it is baled, or from its exposure to bad weather, or from ill usage in its interior transportation, and is not discoverable from an inspection of the bales at the time of shipment. Upon the question, from what the damage in this case arose, the testimony is somewhat conflicting; but it establishes generally, that the cargo was in bad shipping condition when it arrived and was delivered at New York, and that a large part of the bales were old and rotten, and badly torn and damaged, and the cotton therein consequently broken and disordered, and to some extent soiled and damaged by exposure in the shipment and delivery. The picker, who overhauled some two hundred of the bales and put them in order, states, that the cotton was in bad order; that some of the bales were rotten; that several had burst open for want of proper ropes; that others had the bagging torn; and that a portion of

---

[1] [Reported by Samuel Blatchford, Esq., and here reprinted by permission.]
[2] [Affirming Case No. 1,792.]

the bagging was old and rotten, and a portion damaged by wet. What is termed "country damage" arises, in many instances, out of the condition of the cotton at the time it is baled, being wet, or not properly fitted for transportation, and is invisible to the eye on inspection at the time of shipment. But, in this case, the weight of the evidence shows satisfactorily that the effects of the "country damage" upon the external state of the cotton were developed at New Orleans before the cargo was put on board, and that the master was negligent and inattentive to its shipping order in this respect or he would not have accepted it as "in good order and well-conditioned." The voyage was but some twenty days—a period of time hardly sufficient to account for the condition of the bales at the time of their delivery at New York, on the ground of concealed "country damage." On this ground, therefore, the decree of the court below should be affirmed.

The consignees made large advances upon the cotton, on the faith of the representation in the bill of lading that it was shipped in good order. They were justified in doing so, and their security should not be lessened or impaired by permitting the master to contradict his own representation in that instrument. It might be otherwise if the question arose between the master and the owner of the cotton. The question of damage might, in that case, be well limited to that accruing in the course of the voyage, notwithstanding the bill of lading. But the respondents stand in the light of bona-fide purchasers, who become such on the faith of the representations of the master. It is true, that it may be shown that the cotton could have been sold for an excess beyond the advances, sufficient to cover the amount in controversy. But that does not satisfy the principle; for the respondents were entitled to the cargo in the condition described in the bill of lading, as security for their advances, without regard to the fluctuations of the market, or to sales to be made at any particular state of it. Decree affirmed.